IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

—————————————————————

GRACE L. CORNELL,

                Plaintiff,

                                   Civil Action No.
      v.                             6:08-CV-1021 (LEK/DEP)


MICHAEL J. ASTRUE, as Commissioner
of the Social Security Administration,

                Defendant.

—————————————————————

APPEARANCES:                     OF COUNSEL:

FOR PLAINTIFF:

ANTONOWICZ LAW OFFICE        PETER W. ANTONOWICZ, ESQ.
1300 Floyd Avenue
Rome, New York 13440

FOR DEFENDANT:

HON. RICHARD S. HARTUNIAN    TOMASINA DiGRIGOLI, ESQ.
United States Attorney for the       Special Assistant U.S. Attorney
Northern District of New York
Post Office Box 7198
100 South Clinton Street
Syracuse, New York, 13261-7198

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

REPORT AND RECOMMENDATION

    Plaintiff Grace Cornell, who suffers from a variety of medical

conditions and has voiced complaints of residual pain and limitations stemming from a series of hernia surgeries, chronic diarrhea, gastroenteritis, thoracic and cervical neck pain with compression deformity of the thoracic spine at the T-11 level, bilateral hip pain, right knee pain, chronic obstructive pulmonary disease ("COPD"), asthma, allergies, sinusitis, recurrent major depressive disorder, obsessive-compulsive disorder ("OCD"), generalized anxiety disorder, morbid obesity, vertigo, earaches, headaches, left heel pain and a congenitally missing kidney, has commenced this proceeding pursuant to 42 U.S.C. § 405(g) seeking judicial review of a determination by the Commissioner of Social Security finding that she was not disabled at the relevant times, and therefore denying her applications for Title II disability insurance benefits ("DIB") and Title XVI supplemental social security income ("SSI") payments under the Social Security Act ("Act").  Plaintiff alleges that the Commissioner's final decision overlooks opinions of treating physicians regarding her limitations, and is based upon a flawed analysis of her credibility as a witness and of her capabilities notwithstanding the cumulative effects of her various conditions, and accordingly is not supported by substantial evidence.

Having carefully reviewed the record now before the court, considered in light of plaintiff's arguments, I find that the Commissioner's determination was the result of an erroneous application of controlling legal principles and that it lacks the support of substantial evidence. Accordingly, I recommend that plaintiff's motion for judgment on the pleadings be granted and that the matter be remanded to the agency for further consideration.

I.    BACKGROUND

    A.    Non-medical and Vocational Evidence[1]

Plaintiff was born in April of 1971 and was thirty-six years old at the time of the hearing in this matter.  Administrative Transcript (Dkt. No. 7) at 50,793.[2]  Plaintiff lives in a two-story apartment with members of her family in Rome, New York.  AT 83, 792-93.  Plaintiff is a high school graduate, and completed one year of studies in office practice at Mohawk Valley Community College in 1995.  AT 69, 794.

---

[1]    The court summarizes this evidence in large measure without the benefit of plaintiff's disability reports, which are almost entirely illegible and/or unintelligible. *See* AT 83-90, 103-09.

[2]    Portions of the administrative transcript (Dkt. No. 7), which was compiled by the Commissioner and is comprised in large part of the medical records and other evidence that was before the agency when its decision was made, will be cited hereinafter as "AT ___."

It appears that plaintiff has not engaged in substantial gainful employment since May of 2004.[3]  AT 795.  Prior to that date, she worked as a grocery store cashier for an average of twenty-five hours per week beginning on April 17, 1999, AT 64, 71-73, 77, 795, although three hernial repair surgeries and associated recovery periods interrupted her work for six weeks at a time.   AT 72-73, 77, 79.  As a grocery store cashier, plaintiff walked for one hour, stood for five hours, sat for one-quarter hour, stooped for less than one-quarter hour, handled, grabbed or grasped large objects for one hour, reached for one hour and wrote, typed or handled small objects for one hour in a given workday.  AT 65; *see also* AT 795. She specified that the heaviest weight she was required to lift in that position was fifty pounds, and that she frequently lifted ten pounds.  AT 65.

Prior to her employment as a grocery store cashier, plaintiff worked part-time as a housekeeper, receptionist and babysitter.  AT 91, 115.

---

[3]      The record is perplexingly equivocal on the question of whether plaintiff has worked since 2004.  During her hearing testimony plaintiff stated that she has not worked since then.  AT 795.  Plaintiff's social security earning records appear to substantiate this claim, reflecting no reported earnings for the years 2005 through 2007.  AT 58.  Curiously, however, on two separate occasions in 2005 plaintiff reported to health care providers that she was having difficulty with her job.  *See* AT 354, 362.

Plaintiff testified that she can no longer work as a babysitter due to the emotional toll involved. AT 797-98.  She also testified that she would be incapable of fulfilling the requirements of her former job as a receptionist because she finds it "difficult to sit at a desk for more than an hour or so . . . [and] it would be hard to bend over a lot and do the filing."  AT 798. Plaintiff further explained that she cannot return to her work as a housekeeper because it would be "difficult to do shopping on a regular basis for [clients] . . . or to do heavy housekeeping."  AT 799.  In her closing remarks at the hearing, plaintiff testified that "if [she] could work on a regular basis, [she] would.  But with the way [she has] been feeling over the last few years [she does not] feel like [she] can make a really good employee for any company on a full-time basis without calling in a lot or maybe being a liability."  AT 810.

B.   Medical Evidence[4]

Plaintiff has received treatment from several sources for her various conditions, including principally multiple hernia repairs, gastrointestinal

---

[4]      A large portion of the medical evidence included in the Administrative Transcript concerns a period of time long predating the alleged onset of plaintiff's disability.  While the court has reviewed the entire administrative transcript, unless otherwise specifically cited by the parties or the ALJ I have not detailed such anecdotal evidence in this report.

ailments, respiratory ailments, musculoskeletal impairments, and anxiety and depression.

          1.    Physical Impairments

              a)    Hernia

Plaintiff alleges that her multiple hernial repairs have caused her to experience residual and continuing pain and suffer from corresponding limitations.  On August 24, 2000, Beth Bulawa, M.D., surgically repaired plaintiff's ventral and umbilical hernias at Rome Memorial Hospital.  AT 264-71, 308, 312-13.  Dr. Bulawa again surgically repaired plaintiff's ventral hernia at the facility on August 29, 2002.  AT 383-84, 392.

On December 11, 2002, plaintiff presented at the Rome Memorial Hospital urgent care facility with complaints of severe abdominal pain emanating from her hernia repair incision site, which was noted to be well-healed.  AT 488.  Plaintiff was found not to be in acute distress at that time, and was referred back to Dr. Bulawa for evaluation.  *Id.*  Plaintiff underwent additional hernial repair surgery on September 18, 2003.  AT 390-91.

An ultrasound of plaintiff's abdomen on April 5, 2004, revealed no abnormality.  AT 428.  Two years later, plaintiff underwent a computerized

tomography ("CT") scan of her abdomen and pelvis, revealing an umbilical

hernia containing fatty tissue.  AT 538, 605.  Plaintiff was admitted to the

Rome Memorial Hospital on March 24, 2006, for repair of a large

incarcerated, recurrent incisional hernia and was discharged on March 30,

2006.  AT 539-57.

b)      <u>Gastrointestinal Condition</u>

Plaintiff has identified gastrointestinal ailments as a condition

contributing to her alleged disability.  On October 5, 1999, plaintiff

presented to her health care providers complaining of asthma and

abdominal pain.  AT 145.  An abdominal x-ray revealed no acute

problems, and the physician's assistant ("PA") seen on that occasion

assessed plaintiff as experiencing asthma, gastritis, and abdominal pain.

*Id.*

Plaintiff sought medical treatment on August 9, 2003 from the Rome

Medical Group, complaining of vomiting and diarrhea.  AT 469.  The PA

seen by the plaintiff diagnosed her as suffering from gastroenteritis.  *Id.*

During a follow-up visit on August 20, 2003 with Dr. Vivienne Taylor,

of the Rome Medical Group, plaintiff complained of diarrhea and

abdominal cramps.  AT 694.  Dr. Taylor, plaintiff's primary care physician

7

with whom plaintiff treated between June of 2004 and February, 2008, noted that recent stool studies were negative.  AT 691, 694, 730; *see* AT 684-89.

Dr. Taylor referred the plaintiff to Dr. Ajay Goel, M.D., who evaluated plaintiff on September 14, 2007 for her frequent bowel movements with diarrhea and abdominal cramps.  AT 753-54.  In view of plaintiff's chronic diarrhea and family history of colitis, weight loss only by dieting, and the absence of blood or mucus in her stools, Dr. Goel opined that plaintiff may suffer from either lactose deficiency or irritable bowel syndrome.  *Id.*

Plaintiff followed up with another visit to Dr. Goel on July 11, 2008 due to persistent symptoms including chronic diarrhea and reflux.  AT 781-82.  Dr. Goel noted that a colonoscopy showed no colitis and biopsies were negative, while an esophagogastroduodenoscopy with duodenal biopsy suggested a gluten sensitivity; a recent celiac panel, however, was noted to be normal.  *Id.*  Dr. Goel opined that plaintiff could be in the early stages of celiac disease and suggested that she try a gluten-free diet for three months.  Dr. Goel also noted some improvement in plaintiff's chronic diarrhea.  AT 781-88.

8

c)   <u>Obesity</u>

Plaintiff has identified her obesity a factor contributing to her inability

to work.  Although the record contains very little evidence of obesity-

related treatment *per se*, it nonetheless contains ample evidence that she

suffers from that condition.  On August 24, 2000, prior to undergoing

hernial repair surgery, plaintiff was noted as being fifty-eight inches tall

and weighing 230 pounds.  AT 264, 312.  Rome Medical Group records

reflect that on June 14, 2002, plaintiff weighed 258 pounds and was

diagnosed as morbidly obese with a notation that it appeared that her

obesity was increasing.  AT 495.  It was later reported on July 8, 2003 that

plaintiff weighed 266 pounds, even after losing six pounds since April of

that year.  AT 471.  Based upon her increased weight it was

recommended that plaintiff follow-up with an endocrinologist with respect

to her morbid obesity.  AT 471.

Additional treatment notes from Joel D. Amiden, II., D.O., Dr. Taylor,

and various health care providers continually described plaintiff as either

"obese" or "morbidly obese."  *See, e.g.,* AT 137, 148, 345, 351, 361, 366,

379, 463, 510, 518, 734.  Moreover, between August of 1997, at which

time plaintiff weighed 241 pounds, AT 128, and January of 2008, when

she had dropped to 203 pounds, AT 734, plaintiff always weighed above

200 pounds, and at one point was as heavy as 278 pounds.  *See* AT 138,

264, 312, 344, 347, 349, 351, 353, 360, 361, 365, 371, 372, 374, 379,

381, 463, 468, 471, 474, 479, 488, 495, 504, 505, 575, 578, 581, 670,

692.

d) <u>Missing Kidney And Adrenal Tumor</u>

Plaintiff alleges that her congenitally absent kidney and left adrenal

tumor also have contributed to her alleged disability.  On September 8,

2000, a CT scan of plaintiff's pelvis revealed a congenitally absent right

kidney.  AT 436-37.  A subsequent CT scan of plaintiff's pelvis conducted

on March 19, 2001 revealed a low density mass in the area of the left

adrenal gland, characterized as benign and thought to represent a

nonfunctioning adenoma.  AT 434; *see also* AT 440-42.  A CT scan of

plaintiff's abdomen and pelvis conducted on July 7, 2006, revealed a

stable solid left adrenal mass and the absence of a right kidney.  AT 631;

*see also* AT 699 (CT scan of plaintiff's abdomen and pelvis in August of

2007 were unchanged when compared to CT scan from July of 2006).

Further evaluation in September of 2006 revealed that the mass was a

benign neoplasm of the adrenal gland.  AT 558, 562; *see also* AT 559

10

(treatment notes by Dominic Aiello, M.D., dated May 11, 2006, informing

plaintiff that "her mass is nonfunctioning and there is nothing to be

concerned about . . . .").

e)    <u>Respiratory</u>

Plaintiff also suffers from numerous respiratory ailments, including

asthma, COPD, allergies, and sinusitis, and claims that those conditions

have contributed to her alleged disability.  Plaintiff testified at the

administrative hearing that she experiences shortness of breath almost

daily, and develops sinus infections a few times each year.  AT 802-03.

Plaintiff was treated at Rome Memorial Hospital on August 20, 1997,

for complaints of dyspnea.  AT 128.  At that time, spriometry testing

revealed "small airway function diminish."  AT 128.

On August 17, 1999, plaintiff presented at the Rome Medical Group

urgent care facility with complaints of asthma, and was diagnosed with

sinusitis.  AT 150.  A month later, on September 21, 1999, plaintiff

complained of dyspnea upon exertion.  AT 148.  The treatment notes

associated with that visit included an assessment of perennial allergic

rhinitis.  *Id.*  On October 5, 1999, plaintiff again presented with asthma

problems.  AT 145.  On that occasion the PA seen noted that after in-

11

office nebulizer treatment, plaintiff's breath sounds had improved.  *Id.*

Plaintiff again complained of increased asthma symptoms on November 5, 1999.  AT 139.  A PA's assessment from that visit reflects acute exacerbation of asthma and questionable bronchitis.  *Id.*

On April 3, 2001, plaintiff was again treated for acute exacerbation of asthma and bronchitis.  AT 294.  A year later, on June 14, 2002, Dr. Amidon noted that plaintiff's lungs were clear.  AT 495.  On July 8, 2003, Dr. Amidon noted that plaintiff's significant COPD and asthma were well controlled with Singulair, Flovent and Maxair.  AT 471.

Plaintiff's complaints of respiratory related symptoms continued into 2004.  On January 23, 2004, plaintiff presented at Rome Medical Group Urgent Care with complaints of a sore throat, plugged ears, facial pain and pressure, stuffy nose, and fatigue.  AT 514.  Despite these symptoms, plaintiff explained that she was "able to get through her activities of daily living" and that they had not interfered with her work.  *Id.*  Nurse Practitioner Pamela Slagle diagnosed plaintiff on that occasion as suffering from sinusitis.  *Id.*  CT scans of plaintiff's paranasal sinuses taken a short time later on February 26, 2004 revealed no evidence for mucosal thickening and suggested that they were clear.  AT 429, 511.

By early 2005 plaintiff's bronchial condition had improved.  On April 17, 2005, plaintiff reported feeling much better after treatment for asthma, and it was noted that the air exchange in her lungs was much better.  AT 397-400.  At that time, Dr. Taylor diagnosed plaintiff as suffering from asthmatic bronchitis.  *Id.*  Four days later, Dr. Taylor noted that plaintiff had "asthma exacerbation," that her lung exam was much improved, and that spirometry was normal.  AT 368.  Plaintiff followed-up for her chronic asthma on May 5, 2005 with Dr. Taylor, who noted that plaintiff's asthma was stable.  AT 366.  On July 19, 2005, Dr. Taylor remarked that plaintiff's lungs had a few diffuse wheezes but otherwise noted fair air entry and characterized plaintiff's asthma exacerbation as having improved.  AT 361.

Plaintiff's medical records do not disclose significant treatment for plaintiff's respiratory condition during 2006.  The next listed treatment occurred on March 19, 2007, at which time plaintiff registered complaints of post-nasal drip and coughing.  AT 578.  On that occasion, Dr. Taylor noted that plaintiff's respiration was marked by slight diffuse wheezes.  *Id.* That same day, pulmonary function tests revealed normal spirometry.  AT 604.  In April of 2007, upon examination plaintiff's lungs were found clear

13

to auscultation, and Dr. Taylor noted that plaintiff's asthma was improving. AT 575 ,577.

f)      Musculoskeletal Conditions

Plaintiff also claims to suffer from musculoskeletal impairments, including thoracic and cervical neck pain with compression deformity of the thoracic spine at the T-11 level, bilateral hip pain, right knee pain, and left heel pain.  Those complaints date back in some cases at least to 1997.

On November 12, 1999, plaintiff underwent an RMG procedure of the thoracic spine at Rome Memorial Hospital.  AT 135.  Reports of that procedure reflected a compression deformity of the proximal T-11 vertebrae, not significantly changed from results in August of 1997, as well as mild degenerative changes throughout the thoracic spine generally, also unchanged from 1997. *Id.*  During a follow-up visit on December 8, 1999, plaintiff reported experiencing continued back pain.  AT 133.  The nurse practitioner seen by the plaintiff on that occasion noted that a thoracic spine x-ray had suggested a compression fracture at T-11 with considerable spurring.  *Id.*

In or about 2005, plaintiff developed pain in her right hip.  During a

14

visit with Dr. Taylor on July 19, 2005 to address a recent asthma flair up,
plaintiff also complained of recently developed pain in her right hip which
she was unable to attribute to any injury.  AT 361.  Dr. Taylor
characterized plaintiff's right hip pain as "most likely musculoskeletal," and
indicated that the condition would be monitored.  AT 361.

Plaintiff has also lodged complaints of neck and cervical spine pain.
Plaintiff was examined at Rome Memorial Hospital on October 20, 2005,
after complaining of neck pain.  AT 346-47.  Upon examination, plaintiff
was found to have a full range of motion in her neck, though with
accompanying facial grimacing.  *Id.*  A cervical spine film revealed mild
osteophytic changes in the mid and lower cervical segments with no acute
fracture or anterolisthesis.   AT 346, 422.

Plaintiff was seen by Dr. Taylor on March 19, 2007, complaining of
both postnasal drip and coughing, as well as right hip and neck pain.  AT.
578.  Dr. Taylor observed a full-range of motion in plaintiff's right hip, and
indicated a referral would be made to physical therapy.  *Id.*

On April 9, 2007, plaintiff presented at the Rome Medical Group
voicing concerns of her right knee giving out.  AT 575.  Although x-rays of
plaintiff's right knee suggested a small joint effusion and indicated faint

15

vascular calcifications, they were otherwise unremarkable.  *Id.*; *see also* AT 627.   On that occasion, pending results of the x-rays, plaintiff was diagnosed as suffering from right knee pain, and was advised to continue physical therapy.  AT 575.

From May through November of 2006, plaintiff underwent physical therapy at Chestnut Commons Physical Therapy & Rehabilitation Center ("Chestnut") to address neck and shoulder blade pain and right lateral hip and thigh discomfort.   AT 563-74.  It was noted that upon initial examination by providers at Chestnut, plaintiff's cervical pain did not appear to be very intense.  AT 574.  Over the course of her treatment, plaintiff reported improvement in all of her symptoms but was unable to attend her appointments due to interruption of her insurance authorization, asthma, and other medical issues.  AT 563-74.

Between March and May of 2007, plaintiff again received physical therapy at Chestnut to address cervical, right hip, and right knee pain.  AT 661-69.  As a result of those sessions improvement was noted.  *Id.*

### g)    Foot Condition

During a follow-up appointment with Dr. Taylor to address her medical conditions plaintiff complained of experiencing left heel pain over

the prior month, again without attributing the condition to any specific trauma.  AT 351.  Upon examination, Dr. Taylor observed that plaintiff's left heel was tender to palpation.  *Id.*  X-rays of plaintiff's left heel were taken, which did not reveal any fractures but showed a small bone spur was "in the posterior inferior margin of the os calcis."  AT 350, 423.

On October 6, 2005, plaintiff was again treated for complaints of heel pain accompanied by difficulty walking.  AT 348.  On that occasion, Dr. Taylor observed that plaintiff's heel was tender to the touch, and noted that plaintiff was "obviously anxious."  AT 348.  Dr. Taylor described the x-ray of plaintiff's heel as showing only minimal spurring, referred her to physical therapy, prescribed a one-quarter inch heel lift, and advised plaintiff to soak her foot in hot water.  *Id.*

The next reference in plaintiff's medical records to treatments specific to her feet is found in notes of office visits to Daniel Herbowy, D.P.M., on October 18, 2007, and March 13, 2008, during which she registered complaints of bilateral foot pain.  AT 750-51.  Dr. Herbowy diagnosed the plaintiff as suffering from Raynaud disease[5] and

---

[5]     Raynaud disease is a primary or idiopathic vascular disorder characterized by bilateral attacks of Raynaud phenomenon, ischemia of, *inter alia*, toes with severe pallor and often paresthesias and pain.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, 548, 1450 (31st ed. 2007).

Metatarsalgia "with foot strain/sprain with flexible cavus feet" and fitted her for custom biomechanical orthotics. *Id.*

> h)   Treating Source Residual Funcational Capacity Assessments

Dr. Taylor completed a physical residual functional capacity ("RFC") assessment of plaintiff on July 31, 2007.  AT 690-91.  In it, Dr. Taylor opined that plaintiff can 1) occasionally and frequently lift five pounds or less; 2) stand and/or walk without the use of a supportive device for less than one hour in an eight-hour workday; 3) sit in an upright position in a straight back chair for less than two hours in an eight-hour workday; 4) occasionally climb and balance and never kneel, crouch, crawl, or stoop; and 5) occasionally reach in all directions, and additionally that she has frequent use of her gross and fine manipulation at her disposal, and is not limited by temperature extremes, noise, or vibration, but that dust, humidity, hazards, and fumes, odors, chemicals and/or gases posed limitations.  *Id.*  Although asked for this information in the form utilized, Dr. Taylor cited no objective findings in support of her opinions.  *Id.*

> 2.   Mental Impairments

Plaintiff also contends that her anxiety and depression have contributed to her alleged disability.  Plaintiff testified that at times her

18

depression has caused her to remain at her residence "for a few days at a time" and that her anxiety leads her to become easily upset.  AT 803; *see also* AT 64.

Although prior medical records reference complaints of depression and anxiety, *see, e.g.,* AT 495, one of the earlier reports of medical treatments specifically focused upon plaintiff's mental condition is from Dr. Joel P. Amidon, of the Rome Medical Group, rendered on April 1, 2000, in reporting regarding an April 1, 2003 visit by plaintiff "for follow-up of anxiety and depression".  AT 479.  Based upon his examination Dr. Amidon diagnosed the plaintiff as suffering from acute anxiety and depression, along with a variety of physical conditions, and indicated that her prescription for Paxil would be continued and she would additionally be given Vistaril to be used on as an needed basis.  *Id.*

Plaintiff again sought treatment from Dr. Amidon on July 8, 2003 for anxiety and depression.  AT 471.  On that occasion Dr. Amidon rendered the same diagnosis and outlined the same course of treatment.  *Id.*  In his note of that visit, Dr. Amidon wrote that since beginning her prescription for Hydroxyzine, plaintiff reported that her anxiety had "been much better," and opined that plaintiff's anxiety and depression were well-controlled with

Paxil and Vistaril. *Id.*

On January 6, 2004, plaintiff again treated with Dr. Amidon for reassessment of her depression. AT. 518. On that occasion plaintiff reported "doing fairly good except for episodes of anxiety." *Id.* Based upon his assessment of plaintiff's condition Dr. Amidon increased her prescription for Paxil from 25 to 37.5 milligrams. *Id.*

Plaintiff was seen by Dr. Taylor on August 9, 2005, complaining of stress. AT 354. During that visit plaintiff described her job as stressful, and explained that she had problems with her supervisor, and that she had been crying a lot and experiencing a decrease in appetite. *Id.* Dr. Taylor recorded a diagnosis of adjustment disorder, provided her with a note indicating that she should not work until securing a "less stressful job", and was told to return to the office in accordance with a prior scheduled appointment. *Id.*

Plaintiff was seen again by Dr. Taylor on August 25, 2005. AT 352. During that visit, plaintiff advised Dr. Taylor that she was having difficulty getting along with people at work, and that "her anxiety and depression is out of control." *Id.* Plaintiff was diagnosed as suffering from anxiety, depression, and compulsive disorder, and her Paxil prescription dosage

was increased to 60 milligrams, and additionally she was prescribed .5 milligrams of Xanax to be taken three times daily, as needed.  *Id.*  Plaintiff was additionally seen by Dr. Taylor to address her anxiety and obsessive compulsive disorder ("OCD") on September 15, 2005, and again on September 11, 2006.  AT 351, 589.

Plaintiff has also treated with Dr. Florica Ochotorena to address her anxiety and depression.  Dr. Ochotorena initially developed and examined plaintiff's psychiatric history on February 23, 2006.  AT 650-660.  Dr. Ochotorena noted that plaintiff appeared well-kempt and exhibited a normal psychomotor state and fair eye contact.  AT 657.  She noted plaintiff's mood and feelings as sad and anxious, and found plaintiff oriented in three spheres.  AT 658.  Dr. Ochotorena characterized plaintiff's recent, past, and remote memory as intact, and described her attention, judgment and insight as fair, and her fund of information and intelligence as above average.  *Id.*  On Axis I, Dr. Ochotorena's diagnoses included major depressive disorder, recurrent, moderate, and generalized anxiety disorder.  AT 659.  On Axis V, Dr. Ochotorena opined that plaintiff's global assessment of functioning ("GAF") was eighty-five.[6]  AT

---

[6]     The GAF represents a clinical judgment of an individual's overall level of functioning.  *Diagnostic and Statistical Manual of Mental Disorders* (4th ed. 2000)

659-60.

Plaintiff was seen again by Dr. Ochotorena on March 9, 2006, at which time the doctor noted that plaintiff felt better, was less depressed, and her anxiety was under better control.  AT 649.  Dr. Ochotorena also noted that plaintiff's attitude, behavior, and affect were appropriate, but that her mood was depressed and anxious.  *Id.*  She further observed that plaintiff was oriented times three and that her thought process was goal directed.  *Id.*  Dr. Ochotorena reported that plaintiff's memory and attention were good, and her insight and judgment were intact.  *Id.*  Dr. Ochotorena continued her diagnoses of major depressive disorder and generalized anxiety disorder.  *Id.*  Plaintiff continued to treat with Dr. Ochotorena monthly in 2006.  During that year, plaintiff's diagnoses and mental status examination findings remained virtually unchanged.  *Id.*  AT 636-48, 702-03.

Following her treatment with Dr. Ochotorena, plaintiff began receiving mental health-related screening and treatment at Human Technologies Corporation Behavioral Health Services.  AT 705-10.

---

("*DSM-IV*").  The GAF scale ranges from zero to one-hundred, with the lower scores indicating more severe symptoms.  A GAF of between eighty-one and ninety represents the absence of or minimal symptoms and good functioning in all areas. *DSM-IV* at 34.

Plaintiff underwent a psychosocial assessment on November 15, 2007, hoping to decrease her frustration and anger and achieve better functioning in society.  AT 709-10.  On November 8, 2007, plaintiff's therapist prepared a summary in which he described the plaintiff's affect as anxious and her mood as anxious and irritable, and noted that her speech was rapid and pressured, eye contact was appropriate, and she was oriented in all three spheres.  AT 706-08.  The therapist characterized plaintiff's thought process as suspicious and evasive, but found her thought content to be appropriate.  *Id.*  Plaintiff was diagnosed with anxiety disorder, not otherwise specified ("NOS"), and was assigned a GAF of 60, with a recommendation that she undergo routine therapy.[7]  *Id.*

> C.   Consultative Examinations and Non-examining Medical Record Reviews

The agency requested and arranged for physical and psychological consultative examinations of the plaintiff.  AT 99-102.  Plaintiff, however, was unwilling to travel to from Rome, New York, to Syracuse, for the examinations, and therefore declined to attend the scheduled appointments.  *Id.*  Plaintiff was advised that her non-compliance with the

---

[7]     A GAF of 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  *DSM-IV* at 34.

request would result in a decision based upon the evidence already in her file.  *Id.*  Plaintiff reported that she understood the potential ramifications of her non-compliance, and confirmed that she desired a decision made on the evidence already in her file.[8]  *Id.*

On January 3, 2006, Dr. C. Richard Noel, a psychologist, partially completed a psychiatric review technique form with respect to the plaintiff.[9]  AT 519.  Dr. Nobel found there was insufficient evidence to render a medical disposition, but indicated that plaintiff suffers from anxiety-related disorders.  *Id.*

## II.   PROCEDURAL HISTORY

### A.   Proceedings Before the Agency

On October 20, 2005, plaintiff filed applications for DIB and SSI

---

[8]      The Regulations permit an ALJ to deny benefits on the basis of a claimant's failure or refusal to take part in an consultative examination or test arranged by the Social Security Administration, in the absence of good cause to excuse the failure.  *See* 20 C.F.R. §§ 404.1518, 416.918.  The relevant case law, however, "illustrates that the failure to appear for a scheduled examination is rarely seen as a definitive bar to benefits" and instead the claim is most often decided on the basis of the available evidence.  *See McClean v. Astrue*, No. 04-CV-1425, 2009 WL 1918397, at *6 n.4 (E.D.N.Y. Jun. 30, 2009) (citations omitted).  Despite plaintiff's refusal to take part in the consultative examinations, the ALJ did not assess whether plaintiff had good cause for refusing to attend the consultative examination and proceeded to issue a decision based on the available evidence.  *See* Hearing, Appeals, and Litigation Law Manual § I-2-5-24B (Sept. 28, 2005) (available at http://www.socialsecurity.gov/OP_Home/hallex (Screenshot Attached).

[9]      The administrative transcript includes only the first page of that document.

benefits alleging that she became unable to work due to her disabling condition on May 1, 2004.[10]  AT 50-54, 711-18.  Those applications were denied on January 9, 2006.  AT 29-34, 719-24.

A hearing was conducted before Administrative Law Judge ("ALJ") Gordon Mahley, Jr. on November 14, 2007 to consider plaintiff's requests for benefits.  AT 789-811.  Plaintiff appeared and testified at that hearing, accompanied by a paralegal from the office of her counsel.  *See id.* Following the hearing, on February 14, 2007 ALJ Mahley issued a decision finding that the plaintiff was not disabled at the relevant times, and thus denying her applications for benefits.  AT 16-27.

In his decision, ALJ Mahley made a *de novo* review of the available medical records and applied the now familiar, five step test for determining disability, finding first at step one that plaintiff had not engaged in substantial gainful activity since the alleged onset date of her disability.[11]

---

[10]     A claimant is not entitled to receive SSI payments for any month prior to the month after he or she applied for those benefits.  *See* 20 C.F.R. § 416.335; *see also* 42 U.S.C. § 1382(c)(7).  Accordingly, by filing her application for SSI on October 20, 2005, the earliest month plaintiff could be considered as eligible to receive SSI payments would be November of 2005.

[11]     When asked during the hearing why she cannot work, plaintiff responded as follows:

> I have arthritis in my back between my shoulders that goes
> up my neck.  I also have arthritis mainly in the right hip and

AT 21.  At step two ALJ Mahley found that plaintiff's asthma, anxiety, and depression significantly limit her ability to perform basic work activities, and thus qualify as severe impairments under the Act and applicable regulations, but rejected plaintiff's various other conditions as similarly constituting severe impairments.  AT 21-22.  At step three the ALJ concluded that none of the three impairments identified were sufficiently severe, either alone or in combination, to meet or medically equal any of the listed, presumptively disability impairments in the governing regulations, 20 C.F.R. Pt. 404, Subpt. P, App. 1.  AT 22-23.

Before proceeding to step four of the disability calculus, the ALJ set about determining plaintiff's RFC.  AT 23-24.  After rejecting a more restrictive RFC assessment from plaintiff's treating physician, Dr. Taylor,

_____

> knee, and to a point in my left hip and knee.  I have had four hernia surgeries in abdominal area to where it's left it unstable and sore.  I have depression and anxiety that sometimes if I get really upset or that I can't do certain things  [sic].  I can't always take the time away and sometimes I feel like I get sick with a sinus infection or asthma or sick in my abdominal area that I call in and don't feel like I can do it consistently.  I also have acid reflux.

 AT 799-800.  Plaintiff later added that she also suffers from TMJ of the ball and socket behind her ear, as well as high blood pressure.  AT 800.

as lacking support in the medical records and finding, based primarily

upon her accounts of her daily activities, that plaintiff was not credible

when testifying concerning her limitations, ALJ Mahley concluded that

plaintiff

> has the residual functional capacity to lift or carry
> 10 pounds occasionally and less than 10 pounds
> frequently, stand or walk 2 hours in an 8-hour day
> and sit 6 hours in an 8-hour day.  She can perform
> the basic mental demands of competitive,
> remunerative, unskilled work including the abilities
> (on a sustained basis) to understand, carry out and
> remember simple instructions, to respond
> appropriately to supervision, coworkers and usual
> work situations; and to deal with changes in a
> routine work setting.

AT 23-24.   After concluding at step four that, given her RFC, plaintiff is

unable to perform her past relevant work as a cashier in light of the lifting

requirements associated with that position, but finding that despite her

limitations plaintiff retains the capacity to perform essentially all of the

functions associated with unskilled sedentary work, and applying the

medical-vocational guidelines (the "grid") set forth in applicable

regulations, 20 C.F.R. Pt. 404, Subpt. P, App. 2, ALJ Mahley concluded

that there are jobs existing in sufficient numbers within the national

economy that plaintiff is capable of performing and therefore found that

she is not disabled.  AT 25-27.

The ALJ's decision became a final determination of the agency on September 5, 2008, when the Social Security Administration Appeals Council denied plaintiff's request for review of that opinion.  AT 7-11.

B.    This Action

Having exhausted her administrative remedies within the agency, plaintiff commenced this action on September 25, 2008.  Dkt. No. 1. Issue was thereafter joined on January 15, 2009 by the Commissioner's filing of an answer, Dkt. No. 8, preceded by submission of a copy of the administrative transcript of the evidence and proceedings before the agency.  Dkt. No. 7.  With the filing of plaintiff's brief on March 5, 2009, Dkt. No. 10, and that on behalf of the Commissioner on April 20, 2009, Dkt. No. 11, the matter is now ripe for determination, and has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(d).  *See also* FED. R. CIV. P. 72(b).[12]

---

[12]    This matter has been treated in accordance with the procedures set forth in General Order No. 18 (formerly, General Order No. 43) which was issued by the Hon. Ralph W. Smith, Jr., Chief United States Magistrate Judge, on January 28, 1998, and subsequently amended and reissued by Chief District Judge Frederick J. Scullin, Jr., on September 12, 2003.  Under that General Order an action such as this is considered procedurally, once issue has been joined, as if cross-motions for judgment

III.   DISCUSSION

A.   Scope of Review

A court's review under 42 U.S.C. § 405(g) of a final decision by the

Commissioner is limited; that review requires a determination of whether

the correct legal standards were applied, and whether the decision is

supported by substantial evidence.  *Veino v. Barnhart*, 312 F.3d 578, 586

(2d Cir. 2002); *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000); *Schaal*

*v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998); *Martone v. Apfel*, 70 F.Supp.2d

145, 148 (N.D.N.Y. 1999) (Hurd, J.) (citing *Johnson v. Bowen*, 817 F.2d

983, 985 (2d Cir. 1987)).  Where there is reasonable doubt as to whether

the Commissioner applied the proper legal standards, his decision should

not be affirmed even though the ultimate conclusion reached is arguably

supported by substantial evidence.  *Martone*, 70 F.Supp.2d at 148 (citing

*Johnson*, 817 F.2d at 986).  If, however, the ALJ has applied the correct

legal standards and substantial evidence supports the ALJ's findings,

those findings are conclusive, and the decision should withstand judicial

scrutiny regardless of whether the reviewing court might have reached a

_____

on the pleadings had been filed pursuant to Rule 12(c) of the Federal Rules of Civil
Procedure.

contrary result if acting as the trier of fact.  *Veino*, 312 F.3d at 586;

*Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988); *Barnett v. Apfel*, 13

F.Supp.2d 312, 314 (N.D.N.Y. 1998) (Hurd, M.J.); *see also* 42 U.S.C. §

405(g).

The term "substantial evidence" has been defined as " 'such relevant

evidence as a reasonable mind might accept as adequate to support a

conclusion.' "  *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420,

1427 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197,

229, 59 S.Ct. 206, 217 (1938)); *Jasinski v. Barnhart*, 341 F.3d 182, 184

(2d Cir. 2003).  To be substantial, there must be " 'more than a mere

scintilla' " of evidence scattered throughout the administrative record.

*Richardson*, 402 U.S. at 401, 91 S.Ct. at 1427 (quoting *Consolidated

Edison Co.*, 308 U.S. at 229, 59 S.Ct. at 217); *Martone*, 70 F.Supp.2d at

148 (quoting *Richardson* ).  "To determine on appeal whether an ALJ's

findings are supported by substantial evidence, a reviewing court

considers the whole record, examining the evidence from both sides,

because an analysis of the substantiality of the evidence must also

include that which detracts from its weight."  *Williams*, 859 F.2d at 258

(citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 715 S.Ct.

456, 464 (1951)).

When a reviewing court concludes that an ALJ has applied incorrect legal standards, and/or that substantial evidence does not support the agency's determination, the agency's decision should be reversed. 42 U.S.C. § 405(g); *see Martone*, 70 F.Supp.2d at 148. In such a case the court may remand the matter to the Commissioner under sentence four of 42 U.S.C. § 405(g), particularly if deemed necessary to allow the ALJ to develop a full and fair record or to explain his or her reasoning. *Martone*, 70 F.Supp.2d at 148 (citing *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980)). A remand pursuant to sentence six of section 405(g) is warranted if new, non-cumulative evidence proffered to the district court should be considered at the agency level. *See Lisa v. Sec'y of Dep't of Health and Human Servs. of U.S.*, 940 F.2d 40, 43 (2d Cir. 1991). Reversal without remand, while unusual, is appropriate when there is "persuasive proof of disability" in the record and it would serve no useful purpose to remand the matter for further proceedings before the agency. *Parker*, 626 F.2d at 235; *Simmons v. United States R.R. Ret. Bd.*, 982 F.2d 49, 57 (2d Cir.1992); *Carroll v. Sec'y of Health and Human Servs.*, 705 F.2d 638, 644 (2d Cir. 1983).

31

B.      Disability Determination-The Five Step Evaluation Process

The Social Security Act defines "disability" to include the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  In addition, the Act requires that a claimant's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

Id. at § 423(d)(2)(A).

The agency has prescribed a five step evaluative process to be employed in determining whether an individual is disabled.  See 20 C.F.R. §§ 404.1520, 416.920.  The first step requires a determination of whether the claimant is engaging in substantial gainful activity; if so, then the claimant is not disabled, and the inquiry need proceed no further.  Id. at §§ 404.1520(b), 416.920(b).  If the claimant is not gainfully employed, then the second step involves an examination of whether the claimant has

32

a severe impairment or combination of impairments which significantly restricts his or her physical or mental ability to perform basic work activities. *Id.* at §§ 404.1520(c), 416.920(c). If the claimant is found to suffer from such an impairment, the agency must next determine at step three whether it meets or equals an impairment listed in Appendix 1 of the regulations. 20 C.F.R. §§ 404.1520(d), 416.920(d); *see also id.* Part 404, Subpt. P, App. 1. If so, then the claimant is "presumptively disabled." *Martone*, 70 F.Supp.2d at 149 (citing *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984)); *Id.* at §§ 404.1520(d), 416.920(d).

If the claimant is not presumptively disabled, step four requires an assessment of whether the claimant's RFC precludes the performance of his or her past relevant work. *Id.* at §§ 404.1520(f), 416.920(f). If it is determined that it does, then as a final matter the agency must examine whether the claimant can do any other work. *Id.* at §§ 404.1520(g), 416.920(g).

The burden of showing that the claimant cannot perform past work lies with the claimant. *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996); *Ferraris*, 728 F.2d at 584. Once that burden has been met, however, it becomes incumbent upon the agency to prove that the claimant is capable

33

of performing other work.  *Perez*, 77 F.3d at 46.  In deciding whether that

burden has been met, the ALJ should consider the claimant's RFC, age,

education, past work experience, and transferability of skills.  *Ferraris*, 728

F.2d at 585; *Martone*, 70 F.Supp.2d at 150.

      C.     <u>The Evidence In This Case</u>

          1.     <u>Rejection of Treating Physician's Assessment</u>

    In support of her challenge to the Commissioner's determination,

plaintiff argues that the ALJ improperly discounted the opinion of her

treating physician, Dr. Taylor, and relied "more heavily upon the opinions

of the state agency examiners when determining the extent of her work-

related capabilities."[13]  Plaintiff contends that the ALJ should have applied

the treating physician rule and accepted Dr. Taylor's assessment of her

abilities to perform work-related activities.  The Commissioner counters

that the ALJ properly considered Dr. Taylor's assessment and provided

reasons for the weight accorded to it.

    Ordinarily, the opinion of a treating physician is entitled to

considerable deference, provided that it is supported by medically

---

[13]    In this case, unlike the situation normally presented, there were no state agency examination results upon which to rely, a fact principally attributable to plaintiff's refusal to travel to attend scheduled consultative examinations.

acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence.  *Veino*, 312 F.3d at 588; *Barnett*, 13 F.Supp.2d at 316.[14]  Such opinions are not controlling, however, if contrary to other substantial evidence in the record, including the opinions of other medical experts.  *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004); *Veino*, 312 F.3d at 588.  Where conflicts arise in the form of contradictory medical evidence, their resolution is properly entrusted to the Commissioner.  *Veino*, 312 F.3d at 588.  In deciding what weight, if any, an ALJ should accord to medical opinions, he or she may consider a variety of factors including "[t]he duration of a patient-physician relationship, the reasoning accompanying the opinion, the opinion's consistency with other evidence, and the physician's specialization or lack thereof[.]"  *See Schisler v. Sullivan*, 3 F.3d 563, 568 (2d Cir. 1993)

---

[14]     The regulation governing treating physicians provides:

> Generally, we give more weight to opinions from your treating sources . . . If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply [various factors] in determining the weight to give the opinion.

20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

(discussing 20 C.F.R. §§ 404.1527, 416.927).

When a treating physician's opinions are repudiated, the ALJ must provide reasons for the rejection.  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  Compliance with this requirement serves to assist a reviewing court in discerning the weight to be given to a treating physician's opinions and, if rejected, the reasoning employed.  *Halloran*, 362 F.3d at 32-33.  Failure to apply the appropriate legal standards for considering a treating physician's opinions is a proper basis for reversal and remand, as is the failure to provide reasons for rejection of his or her opinions. *Johnson*, 817 F.2d at 985-86; *Barnett*, 13 F.Supp.2d at 316-17.

Dr. Taylor's physical RFC assessment is significantly more restrictive than the RFC finding made by the ALJ.  *Compare* AT 690-91 *with* AT 23-24.  In according less than controlling weight to Dr. Taylor's opinion, the ALJ provided an explanation for doing so.  After noting that Dr. Taylor had been plaintiff's primary care physician since June of 2004, the ALJ observed that Dr. Taylor failed to identify any objective findings to support her opinions as requested in the assessment form she completed. The reasoning afforded for that rejection is proper; it is well-established that an opinion that is not based on clinical findings will not be accorded

36

as much weight as an opinion that is well-supported.  20 C.F.R. §
404.1527(d)(3), 416.927(d)(3); *see also Stevens v. Barnhart*, 473
F.Supp.2d 357, 362 (N.D.N.Y. 2007).

The ALJ went on to note that Dr. Taylor's opinions were inconsistent
with most of her treatment notes, which concerned symptoms relating to
upper respiratory complaints and abdominal pain.  AT 24.  ALJ Mahley
also noted that although Dr. Taylor opined plaintiff cannot stand and/or
walk for even one hour in an eight-hour workday, plaintiff testified that she
can stand and/or walk for three to four hours in an eight-hour day.  AT 24-
25.  He further contrasted Dr. Taylor's opinion that plaintiff can sit in an
upright position in a straight back chair for less than two hours in an eight-
hour workday with plaintiff's testimony that she can sit for four to five
hours in an eight-hour day.[15]  The ALJ also noted that plaintiff was working
in the kitchen at the Rescue Mission in July of 2005, and was asked to
leave not because of any physical limitations, but rather due to her cough.
AT 25.  The less consistent an opinion is with the record as a whole, the

_____

[15]     Plaintiff testified more generally about her functioning over the course of
an entire day, as opposed to an eight-hour workday.  Nonetheless, she testified that
during the day she sits for "maybe about four to five hours.  Then three to four hours
[she] move[s] around."  AT 805.  Plaintiff estimated she can sit for forty-five minutes
and stand for fifteen minutes at any one time without pain.  *Id.*

less weight it merits.  *Stevens*, 473 F.Supp.2d at 362; *see also Otts v. Comm'r of Social Sec.*, 249 Fed. App'x 887, 889 (2d Cir. 2007) (cited in accordance with Fed. R. App. Proc. 32.1) (an ALJ may reject an opinion of a treating physician "upon the identification of good reasons, such as substantial contradictory evidence in the record") (citing *Halloran*, 362 F.3d at 32).

It should be noted, significantly, that nowhere in her extensive records is there an indication that a medical care provider has ever restricted her to lifting or carrying a certain weight.  *See generally* AT 118-788; *but see* AT 464 (a physician's assistant advised plaintiff to avoid "heavy lifting and bending" in November of 2005, after she hurt her back lifting at her residence); AT 518 (Dr. Amidon told plaintiff "that she should not be doing lifting").  The ALJ's decision not to accord deference to Dr. Taylor's opinion under the treating physician rule was therefore not improper and is supported by substantial evidence.

### 2.   Credibility

When assessing her RFC, the ALJ rejected plaintiff's statements concerning her limitations as not entirely credible.  In doing so, ALJ Mahley found that plaintiff's medically determinable impairments could

reasonably be expected to produce the symptoms alleged, but that her statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible.

Plaintiff argues that the ALJ failed to properly apply Social Security Ruling ("SSR") 96-7p and 20 C.F.R. § 404.1529 in assessing her credibility and subjective complaints of pain.  She contends that the ALJ failed to discuss her consistent allegations of pain, which all of her treating physicians found to be credible.  Plaintiff also argues that none of her examining or treating physicians ever raised any question about the accuracy of her complaints or suggested that she had exaggerated her symptoms.  The Commissioner responds arguing that the ALJ fully considered and properly evaluated plaintiff's allegations concerning her subjective complaints of pain and other symptoms.

The claimant's complaints of pain are an important element of the RFC calculus, since pain can have the effect of restricting a claimant's ability to perform work related functions below those which would otherwise obtain.  *See Lewis B. Apfel,* 62 F. Supp.2d 648, 657-58 (N.D.N.Y. 1999).  As the agency's regulations note, "symptoms, including pain, will be determined to diminish [a claimant's] for basic work activities

39

to the extent that . . . [they] can reasonably be accepted as consistent with the objective medical evidence and other evidence.  20 C.F.R. § 404.1529(c)(4).

When examining the issue of pain, an ALJ is not required to blindly accept the subjective testimony of a claimant. *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979); *Martone*, 70 F.Supp.2d at 151 (citing *Marcus* ). Rather, an ALJ retains the discretion to evaluate a claimant's subjective testimony, including testimony concerning pain.  *See Mimms v. Heckler*, 750 F.2d 180, 185-86 (2d Cir. 1984).  In deciding how to exercise that discretion, the ALJ must consider a variety of factors which ordinarily would be relevant on the issue of credibility in any context, including the claimant's motivation and the medical evidence in the record.  *See Sweatman v. Callahan*, No. 96-CV-1966, 1998 WL 59461, at *5 (N.D.N.Y. Feb. 11, 1998) (Pooler, J. and Smith, M.J.) (citing *Marcus*, 615 F.2d at 27-28).  In the end, the ALJ must reach an independent judgment concerning the actual extent of pain suffered and its impact upon the claimant's ability to work.  *Sweatman*, 1998 WL 59461, at *5.

The agency's regulations establish a two-step procedure for evaluating a claimant's contentions of disabling pain.  *See* SSR 96-7P; 20

40

C.F.R. § 404.1529(c).  Initially, the ALJ must determine whether the claimant suffers from a "medically determinable impairment [] that could reasonably be expected to produce" the level of pain alleged.  20 C.F.R. § 1529(c)(1); *see* SSR 96-7P.  Next the ALJ must evaluate the intensity and persistence of the symptoms experienced, considering all of the available evidence and, in the event that the claimant's pain contentions are not substantiated by objective medical evidence, must engage in a credibility analysis.  *See* 20 C.F.R. § 1529(c)(3); *Meadors v. Astrue,* No. 09-3545-CV, 370 Fed. App'x 179, 183-83 (2d Cir. 2010) (summary order) (cited in accordance with Fed. R. App. Proc. 32.1).  In making that assessment the ALJ must consider seven factors listed in the applicable regulations, including 1) the claimant's daily activities, 2) the location, duration, frequency and intensity of any symptoms; 3) any precipitating and aggravating factors; 4) the type, dosage, effectiveness and side effects of any medications taken; 5) other treatment received; 6) other measures employed by the claimant to relieve pain; and 7) other factors concerning the claimant's functional limitations and restrictions resulting from pain.  20 C.F.R. § 404.1529(c)(3)(i)-(vii); *see Meadors*, 370 Fed. App'x 184 n.1.

  After considering plaintiff's subjective testimony, the objective

medical evidence, and any other factors deemed relevant, the ALJ may accept or reject a claimant's subjective testimony.  *Martone*, 70 F.Supp.2d at 151; *see also* 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4).  If such testimony is rejected, however, the ALJ must state the basis for doing so with sufficient particularity to enable a reviewing court to determine whether those reasons for disbelief were legitimate, and whether the determination is supported by substantial evidence.  *Martone*, 70 F.Supp.2d at 151 (citing *Brandon v. Bowen*, 666 F.Supp. 604, 608 (S.D.N.Y. 1987)).  Where the ALJ's findings are supported by substantial evidence, the decision to discount subjective testimony will not be disturbed on review.  *Aponte v. Sec'y, Dep't of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984).

In his decision, ALJ Mahley applied the two-step procedure for determining credibility as to plaintiff's subjective allegations of pain.  The ALJ first found that based upon the evidence in the record, taken as a whole, plaintiff's medically determinable impairments could reasonably be expected to produce the symptoms to which she testified.  AT 25.  This is a finding which draws the support of substantial evidence in the record. Applying the second step, however, ALJ Mahley found plaintiff's complaint

to be only partially credible. *Id.*

In support of her application for benefits, plaintiff's attributed her

inability to work to being unable to tolerate the pain she experiences.  AT

64.  Plaintiff has described her symptomology as follows:

> I have trouble standing and lifting because of
> stomach problems.  I have constant pain.  I also
> have an anxiety problem.  I also have obsessive
> compulsive disorder.  I have back pain.  Shortness
> of breath.  Severe asthma.

*Id.*  During the hearing plaintiff amplified somewhat on the debilitating

effects of her conditions, as illustrated by the following exchange:

> Q.    Why is it that you can't work now?  What are some of
>       your problems that are keeping you from working?
>
> A.    I have arthritis in my back between my shoulders that goes up
>       my neck.  I also have arthritis mainly in the right hip and knee,
>       and to a point in my left hip and knee.  I have had four hernia
>       surgeries in my abdominal area to where it's left it unstable
>       and sore.  I have depression and anxiety that sometimes if I
>       get really upset or that I can't do certain things [sic].  I can't
>       always take the time away and sometimes I feel like if I get
>       sick with a sinus infection or asthma and sick in my abdominal
>       area that I call in and don't feel like I can do it consistently.  I
>       also have acid reflux.

AT 799-800.  Plaintiff testified that because of her impairments she can

only lift approximately ten pounds for a third of a workday and five for two

thirds, and can walk for a half hour and can stand for only approximately

43

ten to fifteen minutes without assistance before experiencing hip and knee pain.  *Id.* at 800-01.

In support of his credibility determination, the ALJ noted that plaintiff was working in July and August of 2005.  He also cited plaintiff's activities, which have included reading books in the library, collecting stamps, cleaning, cooking, shopping, watching television, and visiting with her sister.  AT 25; *see* AT 84-85, 87, 710, 795, 803-04, 807.

The ALJ's findings with respect to plaintiff's credibility are also supported by substantial evidence.  In addition to the matters cited by the ALJ, plaintiff's credibility is undermined by her testimony that she tends to her personal hygiene, AT 807, and her statement that she sometimes babysits for her three-year-old niece.  AT 84.  Moreover, although plaintiff stated that she does not have a driver's license, she is able to use public transportation to travel and indeed traveled to the hearing by bus.  AT 86, 793, 804.  As the ALJ also noted, plaintiff's recurrent upper respiratory infections and sinusitis do not appear to pose limitations upon her ability to perform activities of daily living, AT 21, and the record reflects that such symptoms did not interfere with plaintiff's previous work.  *See* AT 514.

In assessing plaintiff's circumstances, the ALJ made note of

plaintiff's prescriptions, which have included Paxil for anxiety and

depression; Protonix for GERD; Xanax and Buspar.[16]  AT 21-22.  It should

be noted that while plaintiff argues that "[n]one of the many examining and

treating physicians of record raised any question about the accuracy of

the Plaintiff's complaints . . . [or suggested] that [she] exaggerated her

symptoms", *see* Plaintiff's Brief (Dkt. No. 10) at 18, in January of 2001,

Timothy A. Mathis, M.D., found plaintiff to be hypochondriacal.[17]  AT 298.

After considering these facts, the court finds that substantial

evidence supports the ALJ's determination regarding plaintiff's credibility.

### 3.    Obesity

Plaintiff argues that the ALJ failed to properly consider the effects of

her obesity on her physical and mental conditions, as required by S.S.R.

02-01p.  She argues that her morbid obesity exacerbates the limiting

---

[16]    Plaintiff testified that she was taking all of the medications listed in the pre-hearing outline, which in addition to Paxil, Protonix, Xanax and Buspar include Atarax, Maxair, Maxzide, Vistaril, Flovent, Xopenex, Singulair, Zoloft, Zantac, Zyrtec, Ultram ER, Skelaxin, Lortab, Meclozine, Nasonex, Astelin, Avapro, Cutivate Lotion, Norvasc, Sudafed, Effexor and Yasmin.  AT 769, 806; *see also* AT 67-68, 116.  When asked whether she experiences any side effects from taking the medications, plaintiff testified that "[m]ost of the time it's just jitteriness, like with my inhalers.  Some dizziness, some dry mouth, and post-nasal drip."  AT 806; *see also* AT 769.

[17]    Dr. Mathis treated plaintiff for alleged forearm and wrist pain.  AT 298. Upon physical examination, Dr. Mathis found plaintiff's wrist to be completely normal and nontender.  *Id.*  X-rays were taken, with completely normal results.  *Id.*  Dr. Mathis noted that plaintiff had "no physical exam findings whatsoever" and assessed hypochondriasis.  AT 298.

45

effects of injuries to her hips, right knee, and spine, her respiratory and

affective disorders, and her hernias.  Plaintiff's Br. (Dkt. No. 10) at 13-14.

The Commissioner did not address this argument.

When considering whether a claimant's impairments meet or equal

one or more of the conditions listed in the regulations, an ALJ must

consider the claimant's obesity and its effects in combination with any

musculoskeletal impairments.[18]  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1,

§ 1.00(Q); *see also* S.S.R. 02-1p;[19] *Orr v. Barnhart*, 375 F.Supp.2d 193,

_____

[18]     Obesity was eliminated as a listed disability in October of 1999. *See* S.S.R. 00-3p.  The agency, however, has made changes to the listings to ensure that the they still address obesity, and the description of obesity as a potential contributing factor to disability is now referenced in section 1.00(Q) of the listings.

[19]     S.S.R. 02-1p provides that the Administration will consider obesity in determining whether a claimant has a medically determinable impairment; the claimant's individual impairment(s) is severe; the claimant's impairment(s) meets or equals the requirements of a listed impairment; the claimant's impairment(s) prevents him or her from doing past relevant work and other work that exists in significant numbers in the national economy.  It also provides that a listing is met "if there is an impairment that, in combination with obesity, meets the requirements of a listing." S.S.R. 02-1p.  Obesity is a " 'severe' impairment when, alone or in combination with another medically determinable physical or mental impairment(s), it significantly limits an individual's physical or mental ability to do basic work activities."  S.S.R. 02-1p. S.S.R. 02-1p further states that

> [w]hen establishing the existence of obesity, we will generally rely on the judgment of a physician who has examined the claimant and reported his or her appearance and build, as well as weight and height.  Thus, in the absence of evidence to the contrary in the case record, we will accept a diagnosis of obesity given by a treating source or by a consultative examiner.

S.S.R. 02-1p.  The Administration undertakes an "individualized assessment of the

199 (W.D.N.Y. 2005).  As the regulations observe,

> [o]besity is a medically determinable impairment that is often
> associated with disturbance of the musculoskeletal system,
> and disturbance of this system can be a major cause of
> disability in individuals with obesity.  The combined effects of
> obesity with musculoskeletal impairments can be greater than
> the effects of each of the impairments considered separately.
> Therefore, when determining whether an individual with
> obesity has a listing-level impairment or combination of
> impairments, and when assessing a claim at other steps of the
> sequential evaluation process, including when assessing an
> individual's [RFC], adjudicators must consider any additional
> and cumulative effects of obesity.

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.00(Q).

   "The National Institutes of Health (NIH) established medical criteria
for the diagnosis of obesity in its Clinical Guidelines on the Identification,
Evaluation, and Treatment of Overweight and Obesity in Adults (NIH
Publication No. 98-4083, September 1998).  These guidelines classify
overweight and obesity in adults according to Body Mass Index (BMI)."
S.S.R. 02-1p.  "The Clinical Guidelines recognize three levels of obesity.
Level I includes BMIs of 30.0-34.9.  Level II includes BMIs of 35.0-39.9.
Level III, termed 'extreme' obesity and representing the greatest risk for
developing obesity-related impairments, includes BMIs greater than or

_____

impact of obesity on an individual's functioning when deciding whether the impairment
is severe."  S.S.R. 02-1p.

equal to 40.  These levels describe the extent of obesity, *but they do not correlate with any specific degree of functional loss*."  S.S.R. 02-1p (emphasis added).

S.S.R. 02-1p notwithstanding, "an ALJ is not obligated to single out a claimant's obesity for discussion in all cases."  *Yablonski v. Comm'r of Soc. Sec.*, No. 6:03-CV-414, 2008 WL 2157129, at *6 (N.D.N.Y.  Jan. 31, 2008) (Treece, M.J.) (citing *Cruz v. Barnhart*, 04 CIV 9011(GWG), 2006 WL 1228581, at *9 (S.D.N.Y. May 8, 2006) (citing *Guadalupe v. Barnhart*, No. 04 CV 7644, 2005 WL 2033380, at *6 (S.D.N.Y. Aug. 24, 2005))), *report and recommendation adopted*, 2008 WL 2157128 (N.D.N.Y. May 20, 2008) (Scullin, Sr. J.).  Rather, as " '[t]hose circuits which have recently commented on this complaint [that the ALJ did not explicitly consider the claimant's obesity] have held[,] . . . an ALJ's failure to explicitly address a claimant's obesity does not warrant remand . . . . When an ALJ's decision adopts the physical limitations suggested by reviewing doctors after examining the Plaintiff, the claimant's obesity is understood to have been factored into their decisions.' " *Yablonski*, 2008 WL 2157129, at *6 (quoting *Guadalupe*, 2005 WL 2033380, at *6 (citing *Rutherford v. Barnhart*, 399 F.3d 546, 552-53 (3d Cir. 2005), *Skarbek v.*

48

*Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004))) (other citation omitted); *see also Martin v. Astrue*, 05-CV-72, 2008 WL 4186339, at *3-4 (N.D.N.Y. Sept. 9, 2008) (Scullin, Sr. J. and Lowe, M.J.), *aff'd*, 377 Fed. App'x 87 (2d Cir. 2009).

Plaintiff's medical records in this case are replete with evidence of her obesity.  As was discussed above plaintiff's primary treating physician, Dr. Taylor, as well as Dr. Amidon and numerous other medical providers, have consistently described her as obese or morbidly obese, and plaintiff's height and weight buttress their descriptions and/or diagnoses; at a height of four feet, ten inches, and a weight of 202 pounds[20] as of the hearing, AT 794, plaintiff's body mass index is 42.2, which qualifies as extreme obesity.[21]

It is of course true that the mere presence of a disease or impairment alone is insufficient to establish disability; instead, it is the impact of the condition, and in particular any limitations it may impose

---

[20]     The record reflects that plaintiff weighed as much as 278 pounds and at all relevant times weighed in excess of 200 pounds.  *See, e.g.,* AT 63, 128, 138, 264, 312, 344, 353, 361, 365, 371, 372, 374, 379, 468, 471, 474, 479, 488, 495, 504, 505, 670, 692, 734, 794.

[21]     To calculate one's BMI, divide weight in pounds by height in inches squared and multiply by a conversion factor of 703.  *See* Centers for Disease Control and Prevention, http://www.cdc.gov/healthyweight/assessing/bmi/adult_BMI/index.html (site last visited July 21, 2009) (screenshot attached).

upon the ability to perform basic work functions, that is pivotal to the

disability inquiry.  *See Rivera v. Harris*, 623 F.2d 212, 215-16 (2d Cir.

1980); *Coleman v. Shalala*, 895 F.Supp. 50, 53 (S.D.N.Y. 1995).

Plaintiff's medical records fail to establish any work-related limitations

associated with her obesity; there is no evidence of how or to what

degree, if any, plaintiff's obesity has impacted her work function capacity

or aggravated the effects of her other physical and mental impairments.

Rather than demonstrating that plaintiff was limited in her RFC due to her

obesity, the record instead indicates that plaintiff has lived with her obesity

since her teenage years, without any sudden, significant weight gain.  AT

597.

Despite the lack of any medical evidence directly linking plaintiff's

obesity to a functional capacity to perform work-related functions,

evidence of plaintiff's height and weight throughout the record, particularly

given the urging of plaintiff's representative during the hearing to consider

S.S.R. 02-1p with respect to the evaluation of obesity, AT 791-792, should

have sufficed to alert the ALJ that obesity could be a factor in the

determination of her disability.  *See Gallagher v. Astrue*, No. 06-CV-0547,

2009 WL 1405321, at *6-7 (N.D.N.Y. May 18, 2009) (Bianchini, M.J.).  In

this instance, I am unable to conclude that the ALJ indirectly or implicitly considered plaintiff's obesity in light of his rejection of the opinions of Dr. Taylor, plaintiff's treating physician, regarding her physical limitations. Accordingly, in view of the plain language of SSR 02-1p, and the ALJ's failure to indicate that he was even aware of evidence showing plaintiff suffered from obesity, the court recommends the decision be remanded for further consideration of plaintiff's obesity, and an explanation thereof as required by S.S.R. 02-1p and *Cruz. See Rockwood v. Astrue*, 614 F.Supp.2d 252, 278 (N.D.N.Y. 2009).

### 4.    Severity and Combined Effects of Impairments

Plaintiff next argues that the ALJ never fully addressed the balance of her physical and mental impairments as alleged in her application for benefits.  She further argues that the ALJ failed to adequately consider the combined effects of her multiple severe and non-severe impairments, which impose significant limitations on her ability to engage in work-related activities.  The Commissioner maintains that the ALJ properly considered plaintiff's other conditions.

An impairment is severe for purposes of the disability calculus if it "significantly limits physical or mental abilities to do basic work activities."

51

20 C.F.R. §§ 404.1520(c), 416.920(c).  Conversely, an impairment is not severe if it does not significantly limit an individual's ability to perform basic work activities.  *McConnell v. Astrue*, No. 6:03-CV-0521, 2008 WL 833968, at *11 (N.D.N.Y. Mar. 27, 2008) (McAvoy, Sr. J. and Treece, M.J.) (citing 20 C.F.R. § 404.1521(a)).  The regulations define "basic work activities" as the "abilities and aptitudes necessary to do most jobs," examples of which include:

> (1) Physical functions such as walking, standing, lifting, pushing, pulling, reaching, carrying, or handling; (2) Capacities for seeing, hearing, and speaking; (3) Understanding, carrying out, and remembering simple instructions; (4) Use of judgment; (5) Responding appropriately to supervision, co-workers and usual work situations; and (6) Dealing with changes in a routine work setting.

20 C.F.R. § 404.1521(b).

In assessing whether a claimant has a severe impairment, an ALJ must consider the objective medical and nonmedical facts, medical opinions based upon these facts, diagnoses, and plaintiff's subjective complaints of pain.  *See Bluvband v. Heckler*, 730 F.2d 886, 891 (2d Cir. 1984) (superseded by regulation on other grounds).

In this instance, ALJ Mahley specifically found that plaintiff does not have an impairment or combination of impairments that meet or medically

equal one of the listed impairments.  AT 22-23.  With respect to plaintiff's

anxiety and depression, the ALJ noted that in early 2006, the GAF

suggested only minimal limitations associated with her mental condition.

AT 22.  The ALJ also noted that plaintiff's several hernias were all

surgically repaired.  *Id.*  With respect to plaintiff's asthma, the ALJ noted

that pulmonary functioning testing in December of 2006 showed normal

spirometry.  AT 21-22.  The ALJ further noted that plaintiff's complaints of

knee pain resolved with physical therapy.  AT 22.

Although an impairment is found not to significantly limit the

claimant's work functions at step two of the disability analysis, it

nonetheless must be considered by an ALJ if it has the cumulative effect,

when considered in conjunction with impairments found to be severe, of

further restricting the claimant's work place capabilities.  *See Brayton v.*

*Astrue,* No. 1:08-CV-236, 2009 WL 297514, at * 8-9 (N.D.N.Y. Sept. 11,

2009) (Sharpe, J. and Bianchini, M.J.).  In this instance, particularly given

my finding that the ALJ failed to consider plaintiff's obesity, I conclude that

in light of the ALJ's failure to consider plaintiff's obesity, as well as her

other non-severe impairments, in combination with those found to be

severe, the matter should be remanded to the agency for further

consideration.[22]

5.   RFC

Plaintiff contends that in determining her RFC, the ALJ failed to properly weigh the evidence and failed to rely upon acceptable medical evidence.  She emphasizes that no examining source of record offered an assessment of her RFC "identical to, or even consistent with that offered by the ALJ."  The Commissioner argues that the ALJ need not have relied on a medical assessment to support his RFC finding and that the medical evidence, when considered as a whole supports the ALJ's RFC finding.

A claimant's RFC represents a finding of the range of tasks he or she is capable of performing notwithstanding the impairments at issue.  20 C.F.R. §§ 404.1545(a), 416.945(a).  An RFC determination is informed by consideration of a claimant's physical and mental abilities, symptomology, including subjective allegations of pain, and other limitations which could interfere with work activities on a regular and continuing basis.  *Id.*;

---

[22]      In this case the ALJ relied upon the grid to find that the Commissioner had sustained his burden at step five of the disability protocol  AT 26-27.  As plaintiff argues, her non-severe conditions, while not significantly limiting her ability to perform work-related functions, could be deemed to sufficiently erode the job base upon which the grid is predicated to require the ALJ to elicit testimony from a vocational expert in order to determine whether there were jobs in sufficient numbers in the national economy capable of being performed by the plaintiff, given her many limitations. *Correale-Englehart v. Astrue*, 687 F.Supp.2d 396, 442 (S.D.N.Y. 2010).

*Martone*, 70 F.Supp.2d at 150.

To properly ascertain a claimant's RFC, an ALJ must therefore assess his or her exertional capabilities, addressing the ability to sit, stand, walk, lift, carry, push and pull.  20 C.F.R. §§ 404.1545(b), 404.1569a.  The ALJ must also consider nonexertional limitations or impairments, including impairments which result in postural and manipulative limitations.  20 C.F.R. §§ 404 .1545(b), 404.1569a; *see also* 20 C.F.R. Part 404, Subpt. P, App. 2 § 200.00(e).  When making an RFC determination, an ALJ must specify those functions the claimant is capable of performing; conclusory statements concerning his or her capabilities, however, will not suffice.  *Martone*, 70 F.Supp.2d at 150 (citing *Ferraris*, 728 F.2d at 587).  An administrative RFC finding can withstand judicial scrutiny only if there is substantial evidence in the record to support each requirement listed in the regulations.  *Martone*, 70 F.Supp.2d at 150 (citing *LaPorta v. Bowen*, 737 F.Supp. 180, 183 (N.D.N.Y.1990) (McAvoy, J. and Di Bianco, M.J.)); *Sobolewski v. Apfel*, 985 F.Supp. 300, 309-10 (E.D.N.Y. 1997).

Plaintiff estimated that she can frequently lift or carry five pounds and can occasionally lift ten pounds.  She estimated that she can walk for

a half-an-hour without stopping and can stand for "[ten] or [fifteen]

minutes."  AT 800.  She further estimated that she can sit for a half-an-

hour to forty-five minutes at any given time.  Plaintiff also testified,

however, that during the day she sits for "maybe about four to five hours.

Then three to four hours [she] move[s] around."  AT 805.  If she were to

exceed these limitations, plaintiff testified that she would experience pain

in her back, hips, and knees.  AT 801, 805.  Plaintiff testified that she has

no difficulty using her hands and arms.  AT 805.

　　　　The ALJ found that plaintiff has the RFC to perform a wide range of

sedentary work.[23]  AT 23-24.  Specifically, he found that plaintiff has the

ability to lift or carry ten pounds occasionally and less than ten pounds

frequently; stand or walk for two hours in an eight-hour workday; and sit

---

　　　　[23]　　　Sedentary work is defined by regulation as follows:

> Sedentary work involves lifting no more than 10 pounds at
> a time and occasionally lifting or carrying articles like docket
> files, ledgers, and small tools.  Although a sedentary job is
> defined as one which involves sitting, a certain amount of
> walking and standing is often necessary in carrying out job
> duties.  Jobs are sedentary if walking and standing are
> required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a).  In addition, a subsequent ruling has clarified that sedentary
work generally involves periods of standing or walking for a total of two hours in an
eight-hour work day, with sitting up to a total of approximately six hours in a similar
period.  See Social Security Ruling 83-10.

for six hours in an eight-hour workday.  *Id.*  ALJ Mahley further found that plaintiff can perform the basic mental demands of competitive, remunerative unskilled work including the abilities – on a sustained basis –to understand, carry out and remember simple instructions, to respond appropriately to supervision, coworkers and usual work situations and to deal with changes in a routine work setting.  *Id.*

As plaintiff has argued, the ALJ's RFC finding is not supported by the assessment of Dr. Taylor, plaintiff's treating physician.  Moreover, the record contains no assessment supporting the RFC finding, a fact attributable, at least in part to plaintiff's refusal or inability to appear for consultative examinations.  The assessment does draw some support, however, from the plaintiff's own hearing testimony.

The difficulty, once again, lies in the ALJ's failure to consider plaintiff's obesity.  At steps four and five of the analysis, the ALJ must evaluate obesity in conjunction with claimant's RFC by assessing the "effect obesity has upon the individual's ability to perform routine movement and necessary physical activity within the work environment." S.S.R. 02-1p; *see also Orr v. Barnhart*, 375 F.Supp.2d 193, 199 (W.D.N.Y. 2005) (explaining that obesity could affect claimant's exertional

limitations and therefore must be considered in steps four and five).

During this evaluation, the ALJ should bear in mind "[t]he combined

effects of obesity with other impairments . . . ." S.S.R. 02-1p; *see also Orr*,

375 F.Supp.2d at 199 (citing *Willoughby v. Comm' of Soc. Sec.*, 332

F.Supp.2d 542, 549 (W.D.N.Y. 2004)).

     In this instance, the ALJ neither recognized the combined effect of

obesity with plaintiff's other impairments, nor considered her obesity in

conjunction with his RFC analysis.  Accordingly, I recommend remand on

this additional basis with a directive that the ALJ consider plaintiff's

obesity when formulating his or her RFC assessment.

IV.   <u>SUMMARY AND RECOMMENDATION</u>

     Based upon a careful review of the record in this case, I find that the

ALJ properly rejected plaintiff's subjective complaints of disabling pain as

not fully credible and sufficiently explained his rationale.  The ALJ also

properly applied the treating physician rule in according less than

controlling weight to Dr. Taylor's assessment.  The ALJ failed, however, to

give proper consideration to plaintiff's obesity and other non-severe

impairments and any impact they may have on her ability to perform work-

related functions, thus warranting reversal and a return of the matter to

the agency for a proper consideration of plaintiff's conditions and their

cumulative affects upon her ability to perform work-related functions.[24]

Accordingly, it is hereby

RECOMMENDED, that plaintiff's motion for judgment on the

pleadings be GRANTED, the Commissioner's determination of no

disability be VACATED, and the matter REMANDED for further

proceedings.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge

written objections to the foregoing report.  Such objections shall be filed

with the Clerk of the Court within fourteen days.  FAILURE TO SO

OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28

U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 72; *Roldan v. Racette*, 984 F.2d 85

---

[24]     Although plaintiff seeks remand solely for the calculation of benefits, such a course of action is not appropriate in this case.  Reversal and remand for the calculation of benefits is only warranted "when there is 'persuasive proof of disability' [in the record] and further development of the record would not serve any purpose." *Steficek v. Barnhart*, 462 F.Supp.2d 415, 418 (W.D.N.Y. 2006) (quoting *Rosa v. Callahan*, 168 F.3d 72,  83 (2d Cir. 1999)).  Remand for further consideration, on the other hand, is justified when the ALJ has applied an improper legal standard, or further findings and explanations would clarify the ALJ's decision.  *See Rosa,* 168 F.3d at 82-83; *Parker v. Harris,* 626 F.2d 225, 235 (2d Cir. 1980); *Steficek*, 462 F.Supp.2d at 418 (citing *Pratts v. Chater,* 94 F.3d 34, 39 (2d Cir. 1996)).  In this instance, remand is required for the purpose of making further findings and offering additional explanations of the evidence, and not because of a finding that there is persuasive proof of disability in the existing record.

(2d Cir. 1993).

It is further ORDERED that the Clerk of the Court serve a copy of

this report and recommendation upon the parties in accordance with this

court's local rules.

David E. Peebles
U.S. Magistrate Judge

Dated:      December 8, 2010
            Syracuse, NY

# Social Security Administration

## Office of Disability Adjudication and Review

# H A L L E X

# Hearings, Appeals and Litigation Law Manual

# Contents

## Volume I

## Volume II

## Transmittal Sheets

## Recent Transmittals:

Transmittal I-1-60 posted December 1, 2010 replaces chapter I-1-4, Information Disclosure.

Transmittal I-2-79 posted November 3, 2010 replaces sections I-2-5-42 and I-2-5-57.

Transmittal I-1-59 posted November 2, 2010 completely replaces chapter I-1-6, *Congressional Inquiries.*

Transmittal I-2-78 posted August 7, 2009 revises sections I-2-8-60 and I-2-8-98.

Transmittal I-2-77 posted August 7, 2009 revises section I-2-0-60, "Initial Processing of a Request for Hearing."

Transmittal I-4-21 posted August 6, 2009 revises section I-4-3-44, "Special Notices for Blind and Visually Impaired Claimants or Recipients."

Transmittal I-3-41 posted August 6, 2009 revises section I-3-1-70, "Special Notices for Blind and Visually Impaired Claimants or Recipients."

Transmittal I-2-76 posted August 6, 2009 revises section I-2-3-50, "Special Notices for Blind and Visually Impaired Claimants or Recipients."

Transmittal I-2-75 posted August 6, 2009 revises section I-2-1-5, "Conducting Prehearing Case Analysis and Workup."

Transmittal I-1-58 posted June 22, 2009 revises sections I-1-2-12, "Fee Agreements - Evaluation Policy" and I-1-2-14, "Subsequent Decision and Fee Agreement Determination."

Temporary Instruction I-5-1-18 posted June 19, 2009, "Increased Dollar Cap for Fee Agreements."

Transmittal I-2-74 posted June 1, 2009 revises section I-2-0-40, "Request for Hearing - Filing Requirements."

Transmittal I-4-20 posted April 29, 2009 revises section I-4-3-104, "Exhibit — Office of Appellate Operations Geographic Assignments."

Transmittal I-2-73 posted February 12, 2009 revises sections I-2-1-40, I-2-1-55, and I-2-1-95.



**CDC** Centers for Disease Control and Prevention
Your Online Source for Credible Health Information

# About BMI for Adults

**On this page:**

- What is BMI? (#Definition)

- How is BMI used? (#Used)

- Why does CDC use BMI to measure overweight and obesity? (#Why)

- What are some of the other ways to measure obesity? Why doesn't CDC use those to determine overweight and obesity among the general public? (#Other Ways)

- How is BMI calculated and interpreted? (#Interpreted)

- How reliable is BMI as an indicator of body fatness? (#Reliable)

- If an athlete or other person with a lot of muscle has a BMI over 25, is that person still considered to be overweight? (#Athlete)

- What are the health consequences of overweight and obesity for adults? (#Consequences)

- Is BMI interpreted the same way for children and teens as it is for adults? (#Children)

Adult BMI

Calculator
(english_bmi_calculator/bmi_calculator.html)

Body Mass Index (BMI) is a number calculated from a person's weight and height. BMI is a fairly reliable indicator of body fatness for most people. BMI does not measure body fat directly, but research has shown that BMI correlates to direct measures of body fat, such as underwater weighing and dual energy x-ray absorptiometry (DXA).[1, 2] BMI can be considered an alternative for direct measures of body fat. Additionally, BMI is an inexpensive and easy-to-perform method of screening for weight categories that may lead to health problems.

BMI is used as a screening tool to identify possible weight problems for adults. However, BMI is not a diagnostic tool. For example, a person may have a high BMI. However, to determine if excess weight is a health risk, a healthcare provider would need to perform further assessments. These assessments might include skinfold thickness measurements, evaluations of diet, physical activity, family history, and other appropriate health screenings.

Calculating BMI is one of the best methods for population assessment of overweight and obesity. Because calculation requires only height and weight, it is inexpensive and easy to use for clinicians and for the general public. The use of BMI allows people to compare their own weight status to that of the general population.

To see the formula based on either kilograms and meters or pounds and inches, visit How is BMI calculated and interpreted (#Interpreted) ?

Other methods to measure body fatness include skinfold thickness measurements (with calipers), underwater weighing, bioelectrical impedance, dual-energy x-ray absorptiometry (DXA), and isotope dilution. However, these methods are not always readily available, and they are either expensive or need to be conducted by highly trained personnel. Furthermore, many of these methods can be difficult to standardize across observers or machines, complicating comparisons across studies and time periods.

**Calculation of BMI**
BMI is calculated the same way for both adults and children. The calculation is based on the following formulas:

| Measurement Units | Formula and Calculation |
|---|---|
| **Kilograms and meters (or centimeters)** | Formula: weight (kg) / [height (m)]$^2$<br>With the metric system, the formula for BMI is weight in kilograms divided by height in meters squared. Since height is commonly measured in centimeters, divide height in centimeters by 100 to obtain height in meters.<br><br>Example: Weight = 68 kg, Height = 165 cm (1.65 m)<br>Calculation: $68 \div (1.65)^2 = 24.98$ |
| **Pounds and inches** | Formula: weight (lb) / [height (in)]$^2$ x 703<br>Calculate BMI by dividing weight in pounds (lbs) by height in inches (in) squared and multiplying by a conversion factor of 703.<br><br>Example: Weight = 150 lbs, Height = 5'5" (65")<br>Calculation: $[150 \div (65)^2]$ x 703 = 24.96 |

**Interpretation of BMI for adults**

6:08-CV-1021
APPENDIX B
Last viewed by Magistrate Judge David E. Peebles on Dec. 8, 2010

For adults 20 years old and older, BMI is interpreted using standard weight status categories that are the same for all ages and for both men and women. For children and teens, on the other hand, the interpretation of BMI is both age- and sex-specific. For more information about interpretation for children and teens, visit Child and Teen BMI Calculator (http://apps.nccd.cdc.gov/dnpabmi) .

The standard weight status categories associated with BMI ranges for adults are shown in the following table.

| BMI | Weight Status |
|---|---|
| Below 18.5 | Underweight |
| 18.5 – 24.9 | Normal |
| 25.0 – 29.9 | Overweight |
| 30.0 and Above | Obese |

For example, here are the weight ranges, the corresponding BMI ranges, and the weight status categories for a sample height.

| Height | Weight Range | BMI | Weight Status |
|---|---|---|---|
| 5' 9" | 124 lbs or less | Below 18.5 | Underweight |
| | 125 lbs to 168 lbs | 18.5 to 24.9 | Normal |
| | 169 lbs to 202 lbs | 25.0 to 29.9 | Overweight |
| | 203 lbs or more | 30 or higher | Obese |

The correlation between the BMI number and body fatness is fairly strong; however the correlation varies by sex, race, and age. These variations include the following examples: [3, 4]

- At the same BMI, women tend to have more body fat than men.
- At the same BMI, older people, on average, tend to have more body fat than younger adults.
- Highly trained athletes may have a high BMI because of increased muscularity rather than increased body fatness.

It is also important to remember that BMI is only one factor related to risk for disease. For assessing someone's likelihood of developing overweight- or obesity-related diseases, the National Heart, Lung, and Blood Institute guidelines recommend looking at two other predictors:

- The individual's waist circumference (because abdominal fat is a predictor of risk for obesity-related diseases).
- Other risk factors the individual has for diseases and conditions associated with obesity (for example, high blood pressure or physical inactivity).

For more information about the assessment of health risk for developing overweight- and obesity-related diseases, visit the following Web pages from the National Heart, Lung, and Blood Institute:

- Assessing Your Risk (http://www.nhlbi.nih.gov/health/public/heart/obesity/lose_wt/risk.htm)
- Body Mass Index Table (http://www.nhlbi.nih.gov/guidelines/obesity/bmi_tbl.htm)
- Clinical Guidelines on the Identification, Evaluation, and Treatment of Overweight and Obesity in Adults (http://www.nhlbi.nih.gov/guidelines/obesity/ob_home.htm)

According to the BMI weight status categories, anyone with a BMI over 25 would be classified as overweight and anyone with a BMI over 30 would be classified as obese.

It is important to remember, however, that BMI is not a direct measure of body fatness and that BMI is calculated from an individual's weight which includes both muscle and fat. As a result, some individuals may have a high BMI but not have a high percentage of body fat. For example, highly trained athletes may have a high BMI because of increased muscularity rather than increased body fatness. Although some people with a BMI in the overweight range (from 25.0 to 29.9) may not have excess body fatness, most people with a BMI in the obese range (equal to or greater than 30) will have increased levels of body fatness.

It is also important to remember that weight is only one factor related to risk for disease. If you have questions or concerns about the appropriateness of your weight, you should discuss them with your healthcare provider.

The BMI ranges are based on the relationship between body weight and disease and death.[5] Overweight and obese individuals are at increased risk for many diseases and health conditions, including the following: [6]

- Hypertension
- Dyslipidemia (for example, high LDL cholesterol, low HDL cholesterol, or high levels of triglycerides)
- Type 2 diabetes
- Coronary heart disease
- Stroke
- Gallbladder disease
- Osteoarthritis

- Sleep apnea and respiratory problems
- Some cancers (endometrial, breast, and colon)

For more information about these and other health problems associated with overweight and obesity, visit Clinical Guidelines on the Identification, Evaluation, and Treatment of Overweight and Obesity in Adults (http://www.nhlbi.nih.gov/guidelines/obesity/ob_home.htm) .

Although the BMI number is calculated the same way for children and adults, the criteria used to interpret the meaning of the BMI number for children and teens are different from those used for adults. For children and teens, BMI age- and sex-specific percentiles are used for two reasons:

- The amount of body fat changes with age.
- The amount of body fat differs between girls and boys.

Because of these factors, the interpretation of BMI is both age- and sex-specific for children and teens. The CDC BMI-for-age growth charts take into account these differences and allow translation of a BMI number into a percentile for a child's sex and age.

For adults, on the other hand, BMI is interpreted through categories that are not dependent on sex or age.

[1]Mei Z, Grummer-Strawn LM, Pietrobelli A, Goulding A, Goran MI, Dietz WH. Validity of body mass index compared with other body-composition screening indexes for the assessment of body fatness in children and adolescents. *American Journal of Clinical Nutrition* 2002;7597–985.

[2]Garrow JS and Webster J. Quetelet's index (W/H2) as a measure of fatness. *International Journal of Obesity* 1985;9:147–153.

[3]Prentice AM and Jebb SA. Beyond Body Mass Index. *Obesity Reviews*. 2001 August; 2(3): 141–7.

[4]Gallagher D, et al. How useful is BMI for comparison of body fatness across age, sex and ethnic groups? *American Journal of Epidemiology* 1996;143:228–239.

[5]World Health Organization. Physical status: The use and interpretation of anthropometry. Geneva, Switzerland: World Health Organization 1995. WHO Technical Report Series.

[6]Clinical Guidelines on the Identification, Evaluation, and Treatment of Overweight and Obesity in Adults (http://www.nhlbi.nih.gov/guidelines/obesity/ob_home.htm) .

back to top (#top)

Page last reviewed: July 27, 2009
Page last updated: July 27, 2009
Content source: **Division of Nutrition, Physical Activity and Obesity** (http://www.cdc.gov/nccdphp/dnpao/index.html) , National Center for Chronic Disease Prevention and Health Promotion (http://www.cdc.gov/nccdphp/)

USA.gov
Government Made Easy

Centers for Disease Control and Prevention   1600 Clifton Rd. Atlanta, GA 30333, USA
800-CDC-INFO (800-232-4636) TTY: (888) 232-6348, 24 Hours/Every Day - cdcinfo@cdc.gov

6:08-CV-1021

APPENDIX B

Last viewed by Magistrate Judge David E. Peebles on Dec. 8, 2010